**STATE of Utah, Plaintiff and Appellee,**

v.

**Donald Wayne GAMBRELL,**
**Defendant and Appellant.**

No. 900559–CA.

Court of Appeals of Utah.

June 26, 1991.

Rehearing Denied July 19, 1991.

James M. Park, The Park Firm, Cedar City, for defendant and appellant.

Scott M. Burns, Cedar City, for plaintiff and appellee.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

BILLINGS, Associate Presiding Judge:

Defendant appeals from his conviction of three counts of negligent homicide in violation of Utah Code Ann. § 76–5–206 (1990). As a threshold matter he challenges the trial court's jurisdiction and in addition challenges the court's imposition of three consecutive sentences, one term for each victim killed in the traffic accident. We affirm.

The basic facts are not in dispute. Gambrell was driving a large truck loaded with 78,000 pounds of steel down a grade when the braking system of the truck catastrophically failed.

In an attempt to stop the truck, Defendant steered it across the opposing lane of traffic toward a hillside. As he crossed into the opposing lane the victims came around the bend in their vehicle. All three were killed in the ensuing crash.

Inspection of the six brakes that were not destroyed in the accident established that none were adjusted according to federal or state requirements. The State's expert testified that at the time of the accident Defendant had no potential to stop. Defendant admitted that he did not know how to adjust the brakes and that the brakes had not been adjusted since he left Tennessee.

An information was signed by the putative Iron County Attorney, Scott M. Burns, and Defendant was ultimately tried by jury. The jury convicted Defendant of three counts of negligent homicide and the judge sentenced him to three consecutive one year terms in the Iron County Jail, one year on each count.

Defendant appeals his convictions. First, he claims the Iron County Attorney who signed the information instituting proceedings against him had not posted a bond upon taking office and thus was without authority to file the information. Defendant argues that because of the defective information the court did not have jurisdiction. Second, Defendant claims the trial court exceeded its authority under the negligent homicide statute by imposing three consecutive sentences, one term for each victim killed. These are questions of law and thus we review the trial court's actions for correctness. *City of Monticello v. Christensen*, 788 P.2d 513 (Utah), *cert. denied*, —— U.S. ——, 111 S.Ct. 120, 112 L.Ed.2d 89 (1990).

## I. DE FACTO COUNTY ATTORNEY

Initially, Defendant claims that because the Iron County Attorney, who signed the information initiating charges against him, never filed a bond as required by Utah Code Ann. § 17–16–11 (Supp. 1990),[1] the county attorney was without

---

1. "The board of county commissioners shall prescribe by ordinance the amount in which the following county and precinct officers shall execute official bonds before entering upon the

authority to initiate the charges. He thus argues the trial court did not have jurisdiction to hear the case, and his convictions must be vacated.[2]

Defendant relies on Utah Code Ann. § 52–2–1 (1989), which provides that an office which requires a bond becomes vacant if the holder does not file the requisite bond within sixty days of the beginning of his term.

> Whenever any person duly elected or appointed to any office of the state or any of its political subdivisions, fails to qualify for such office within sixty days after the date of the beginning of the term of office for which he was elected or appointed, such office shall thereupon become vacant and shall be filled as provided by law.

Utah Code Ann. § 52–2–1 (1989).

Defendant calls our attention to two early Utah cases to support his position that because of the operation of section 52–2–1 the trial court lacked jurisdiction. In *State v. Beddo*, 22 Utah 432, 63 P. 96 (1900), the court reversed a conviction based on a defective information signed by a purported district attorney. The office of district attorney had been created by a new legislative act eliminating the position of county attorney. The court struck down the new district attorney act as the sections of the code to be repealed were not set out in their entirety as required by the state constitution, holding that the district attorneys had no power to sign informations.

Appellant further supports his theory referring to *State ex rel. Stain v. Christensen*, 84 Utah 185, 35 P.2d 775 (1934). In *Christensen*, three men each claimed to be the State Treasurer. Mr. Christensen had been elected treasurer in 1928, posted bond and held the office. In 1932, Mr. Stain was elected treasurer, but as he failed to post bond Mr. Christensen refused to turn the office over to him. During 1932, the legislature passed the antecedent of section 52–2–1 which provides that an office becomes vacant should the holder fail to post bond. Relying on this vacancy statute, the governor appointed Mr. Hoge treasurer. Mr. Christensen also refused to turn over the office to him. The court held that Mr. Hoge was the treasurer, that Mr. Stain had never held the office and that Mr. Christensen had properly held over until the matter was settled but now must give up the office to Mr. Hoge who had been appointed to the vacant office and had complied with all of the requirements for occupying it, including filing a bond. Some consideration was given in dissent to the issue of de facto officers, but the majority pointed out that Mr. Stain, "is not, and has not been, in possession of the office of State Treasur-

---

discharge of the duties of their respective offices, viz.: ... county attorney...." Utah Code Ann. § 17–16–11 (Supp.1990).

2. The State responds that a blanket bond issued by Western Surety Company covered the Iron County Attorney and thus he did in fact file a bond in compliance with section 17–16–11. We disagree. The blanket bond referred to by the State specifically excludes any employee who is required by law to give a bond for honesty or the faithful performance of his duties. The bond offers two coverages: honesty and faithful performance. Each provision excludes coverage for acts by persons required by law to file a bond.

a. *Honesty*
"Employee" as used in Insuring Agreements 1 and 2 means a person while in the employ of the Insured during the Bond Period *who is not required by law to give a bond conditioned for the faithful performance of his duties* and who is a member of the staff or personnel of the Insured but does not mean the Treasurer or Tax Collector, by whatever title known, of the Insured.

b. *Faithful performance*
"Employee" as used in Insuring Agreements 3 and 4 means a person while in the employ of the Insured during the Bond period *who is not required by law to furnish an Individual Bond to qualify for office* and who is a member of the staff or personnel of the Insured but does not mean any Treasurer or Tax Collector by whatever title known.

The State offers a letter purportedly signed by the bond company's general counsel stating that the bond covers Mr. Burns as the county attorney. It would be improper for us to consider this extraneous evidence as to the intent of the parties. The blanket bond's clear and unambiguous language prevents the reading proposed by the State and supported by the extraneous evidence. *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720 (Utah 1990). *Breuer–Harrison, Inc. v. Combe*, 799 P.2d 716 (Utah App.1990).

er." *Christensen,* 84 Utah at 202, 35 P.2d at 782.

Neither case relied on by Defendant is similar to the facts presented in this appeal. In *Beddo,* there was no office to hold. The statute creating the office of district attorney was void. In *Christensen,* the question was who held the office of state treasurer, not whether the acts of the treasurer were valid. In the case before us attorney Burns assumed a constitutionally established office and *performed* its functions.

■ We find this case more akin to *Vance v. Fordham,* 671 P.2d 124 (Utah 1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).[3] In that case the court upheld the actions of an administrative licensing authority even though one of its members lacked statutory qualifications. The court concluded that there was no jurisdictional defect because the member was a de facto officer. The *Vance* court cited *Hussey v. Smith,* 99 U.S. 20, 25 L.Ed. 314 (1878), in its decision. In *Hussey,* the United States Marshal foreclosed on and sold property in the Utah Territory though it was later determined that he had no authority to do so. In upholding the sales the United States Supreme Court stated:

> An officer *de facto* is not a mere usurper, nor yet within the sanction of law, but one who, *colore officii,* claims and assumes to exercise official authority, is reputed to have it, and the community acquiesces accordingly. Judicial and ministerial officers may be in this position. The acts of such officers are held to be valid because the public good requires it. The principle wrongs no one. A different rule would be a source of serious and lasting evils.

*Hussey,* 99 U.S. at 24 (citations omitted).

Actions of de facto officers have been upheld in the face of challenge in other jurisdictions under circumstances similar to the case before us. *See, e.g., People v.*

*Kempley,* 205 Cal. 441, 271 P. 478 (1928) (special counsel for state who assumed and exercised duties of public officer under authorized appointment was an officer de facto though not taking oath of office); *People v. Montoya,* 44 Colo.App. 234, 616 P.2d 156 (1980) (even if ineligible as special prosecutors, members of Attorney General's office acted as de facto officers); *State v. Jaramillo,* 113 Idaho 862, 749 P.2d 1 (Ct. App.1987) (if appointment of deputy prosecuting attorney not filed, he was at least a de facto deputy prosecuting attorney); *Gragg v. State,* 112 Neb. 732, 201 N.W. 338 (1924) (where not qualified, person holding himself out as county attorney is such officer de facto); *People v. Jackson,* 163 A.D.2d 489, 558 N.Y.S.2d 590 (1990) (reversing by memorandum opinion the order of a trial court which vacated a conviction when the prosecuting deputy district attorney was not a member of any bar); *In re G.V.,* 136 Vt. 499, 394 A.2d 1126 (1978) (state's attorney who failed to file a bond is a de facto officer; her motion to terminate parental rights conferred jurisdiction on the lower court); *Pamanet v. State,* 49 Wis.2d 501, 182 N.W.2d 459 (1971) (when a district attorney elected in one county served two counties, though his acts are arguably illegal as to the second county he was an officer de facto).

■ Under the de facto doctrine the acts of one who assumes official authority and exercises duties under color of a valid appointment or election are valid where the community acquiesces to his authority. The mere failure to comply with a technical requirement does not void the official's actions as to third parties and the public. The acts are valid if in the interest of justice. *Vance* 671 P.2d at 131 n. 5 (citing *State v. Carroll,* 38 Conn. 449, 472 (1871)).

Scott M. Burns was duly elected the Iron County Attorney. He entered into the discharge of the duties of that existing office, and discharged his duties for the public good. The community acquiesced to his

---

3. The State improperly directs us to our unpublished decision in *Elwood v. Holden,* Case No. 890609–CA (Utah App. March 21, 1990). Unpublished decisions have no precedential value and cannot be cited or used except for the purposes of applying the doctrine of the law of the case, res judicata, or collateral estoppel. Utah Code of Judicial Administration R4–605.

exercise of the duties of the office. The only defect to Burns' holding the office de jure was his failure to file an acceptable bond. We therefore conclude that the filing of the information instituting proceedings against Defendant was the valid act of a de facto county attorney and conferred jurisdiction upon the court.

## II. MULTIPLE CONVICTIONS

■ Next, Defendant argues that he can be convicted and sentenced on only one count of criminal homicide, not three, as all of the deaths resulted from one accident. Defendant relies on Utah Code Ann. § 76–1–402(1) (1990).

> [W]hen the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision.

Defendant's argument is contrary to Utah law. The Utah Supreme Court in *State v. James*, 631 P.2d 854 (Utah 1981), held, "In crimes against the person (as contrasted with crimes against property), a single criminal act or episode may constitute as many offenses as there are victims." *James*, 631 P.2d at 855.

The Utah Court of Appeals followed *James* recently in *State v. Mane*, 783 P.2d 61 (Utah App.1989). The defendant in *Mane*, among other things, fired a single bullet that harmed two people. The court specifically addressed Defendant's contention that section 76–1–402(1) prevented his punishment for the injury to each victim.

> [T]he term "same act" as used in section 76–1–402(1) should be read in conjunction with the latter statutory language in the same section, pertaining to offenses under different provisions of the code which may be violated by a single act. As implied in *James*, for example, the single act of shooting Brown could be chargeable as first degree homicide, neg-

ligent homicide or manslaughter. However, the shooting of a second victim, albeit with the same bullet, is not an offense "which may be punished in different ways under the different provisions of this code," but is punishable as a separate offense. We do not believe that the legislature intended to preclude greater punishment where multiple victims exist.... We, therefore, hold that "act" as used in section 76–1–402(1) includes not only volitional acts of a defendant, but also the number of victims, as each is acted upon by a defendant.... Each striking was an "act" constituting a separate offense, allowing separate charges and convictions.

*Mane*, 783 P.2d at 64–65.

Utah's position is consistent with a large majority of jurisdictions which specifically endorse multiple convictions and possible consecutive punishments where there are multiple victims of a single criminal act. *See, e.g., People v. Lovett*, 90 Mich.App. 169, 283 N.W.2d 357 (1979); *Vigil v. State*, 563 P.2d 1344 (Wyo.1977). These cases, and others, are collected in Owens, *Alabama's Minority Status: A Single Conviction Injuring Multiple Persons Constitutes Only a Single Offense*, 16 Cumb.L. Rev. 85 (1985).

This principle has been applied to negligent homicide where several persons were killed in one automobile accident. *State v. Miranda*, 3 Ariz.App. 550, 416 P.2d 444 (1966) (driver's single course of conduct can result in multiple offenses as the killing of each person constitutes a separate offense); *Murray v. United States*, 358 A.2d 314 (D.C.1976) (judge had power to impose consecutive sentences for negligent homicide of two persons in a single automobile accident); *State v. Whitley*, 382 S.W.2d 665 (Mo.1964) (killing of three people in one automobile accident constituted three separate offenses for which three consecutive sentences could be imposed).[4]

**4.** Recent cases that uphold this principle include *State v. Dunlop*, 721 P.2d 604 (Alaska 1986) (overturning prior decisions and adopting one count per victim with consecutive sentences for each count allowable); *State v. Clark*, 227 N.J.

Super. 204, 545 A.2d 1366 (App.Div.1988) (when different victims are involved there are as many offenses as individuals affected); *Ex parte Rathmell*, 717 S.W.2d 33 (Tex.Crim.App.1986) (en banc) (death of each passenger in an automo-

Defendant was properly charged and convicted for three separate counts of negligent homicide. The imposition of consecutive sentences on each count was within the discretion of the trial court.

We affirm.

GREENWOOD and JACKSON, JJ., concur.

bile a complete and distinct offense in context     of involuntary manslaughter).